UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEVON LAMAR HAMPTON,

        Petitioner,                                      Case Number 19-12890

v.                                                      Honorable David M. Lawson

ROBERT VASHAW,

        Respondent,
_____/

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Devon Lamar Hampton shot and killed coworker Jonathan Holmes during an altercation at their place of employment. He argued that he acted in self-defense, but a Wayne County, Michigan jury convicted him of first-degree premeditated murder and firearm offenses. His appeals through the state courts were unsuccessful, and he has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Hampton argues that the state court should have appointed a different lawyer to represent him and the one he had made critical mistakes, the prosecutor committed misconduct, the judge should have given a missing witness instruction, and there was insufficient evidence of premeditation. The state courts did not unreasonably apply federal law when they denied relief on these claims. The Court will deny the petition.

I.

The shooting took place on September 2, 2016 at the AJM Packaging plant in Detroit. According to the Michigan Court of Appeals,

> [t]he shooting occurred around 11:30 p.m. Aaron Spratling testified that he had just clocked in and was making small talk with Hampton when Holmes walked up behind Hampton in an aggressive manner. Spratling recounted that Holmes stated, "Let me holler at you real quick," and Hampton responded, "I don't mess with you like that." Spratling headed toward his work station, but looked back when he was approximately 15 to 20 feet away. He testified that Hampton and Holmes were

>around five or six feet apart. Hampton was backing away from Holmes, who had a bag in his hand and kept saying, "No. Let me holler at you real quick. Let me holler at you."  Another witness, Scott Zigler, testified that he observed Hampton and Holmes having an "unhappy" argument, but he could not make out anything other than "a couple of curing [sic] words back and forth between the two."  Zigler and Spratling both testified that they saw Hampton shoot Holmes, who died from a single gunshot wound to the chest.

*People v. Hampton*, No. 337431, 2018 WL 4575175, at * 1 (Mich. Ct. App. Sept. 20, 2018).

A police officer testified that there was a retention pond to the west of the parking lot of the factory where the shooting took place.  The arresting officer testified that Hampton was soaking wet when arrested in the parking lot of AJM moments after the shooting.  The police investigated the pond because they believed that Hampton had gone into it.  Hampton's wet, muddy clothing and two wet cellphones were sent to the Michigan State police laboratory for testing.  No gun was recovered at the time of Hampton's arrest; however, the following morning police found a handgun belonging to Hampton outside the door of a building, suggesting that Hampton discarded the weapon after the shooting.

Hampton argued at trial that the shooting was in self-defense.  The jury did not accept that argument and convicted him of the premeditated killing.  It acquitted him of feloniously assaulting Scott Zigler.  The trial court sentenced Hampton to life in prison without the possibility of parole.  Hampton's convictions were affirmed on direct appeal.  *Id.*; *leave to appeal denied* 503 Mich. 1032, 926 N.W.2d 803 (2019) (table).

Throughout the proceedings, Hampton expressed dissatisfaction with his trial attorney.  He raised the issue at the preliminary examination, but his complaint was referred to the trial court.  The trial judge determined that Hampton's main complaint was that his attorney did not meet with him often enough and at the times promised.  Hampton's request for a different attorney was denied.

Hampton filed his petition for a writ of habeas corpus, alleging the following grounds:

I. Petitioner was denied his state and federal constitutional rights to the effective assistance of counsel through the trial court's refusal to appoint a new attorney to represent him.

II. Petitioner was denied his state and federal constitutional rights to due process to a fair trial through the prosecution's misconduct during closing argument, shifting the burden. Petitioner was also denied his state and federal constitutional right to the effective assistance of counsel because counsel failed to object to prosecution's misconduct in opening and closing arguments. Counsel also made inflammatory remarks to the jury during closing arguments.

III. Petitioner was denied a fair trial in violation of his state and federal constitutional rights to due process through the prosecutor's failure to present sufficient evidence to each element of first-degree murder to establish guilt beyond a reasonable doubt, even when viewed in a light most favorable to the prosecution. Also, the prosecution elicited false/inadmissible evidence through the misuse of expert testimony, misleading the jury. And the trial court abused its discretion by failing to give the missing witness instruction.

Pet. at 5, 7, 8, ECF No. 1, PageID.5, 7, 8.

In his response, the warden argues that some of the instances of prosecutorial misconduct were not brought to the state court's attention by contemporaneous objection or on appeal, and therefore they are subject to the defense of procedural default. The other claimed constitutional violations, he says, are meritless.

The "procedural default" argument is a reference to the rule that the petitioner did not preserve properly some of his claims in state court, and the state court's ruling on that basis is an adequate and independent ground for the denial of relief. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Court finds it unnecessary to address the procedural question. It is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix*

*v. Singletary*, 520 U.S. 518, 525 (1997)). The procedural defense will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable."

*Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)).

A.

In his first argument, Hampton contends that his Sixth Amendment right to counsel was violated because his court-appointed attorney did not represent him properly, and the court should have appointed a different lawyer for him. He brought his dissatisfaction to the attention of the district court judge before the preliminary examination, stating that his attorney had not met with him for over a week. The district judge learned that counsel had been appointed two weeks earlier and met with Hampton at the jail. Counsel explained that there was a delay receiving discovery materials, but he assured the judge that he had "had an extensive conversation about the case" with Hampton. *Hampton*, 2018 WL 4575175, at *1. The district judge did not find a basis for a substitution.

Later, Hampton sent a letter to the circuit court judge asking for a new lawyer because he did not believe he was being "represented right." He explained:

> My lawyer told me he would see me when I get back to the jail and haven't seen him since. I don't want to get railroaded. I don't want a lawyer that looks at me as just another person on the clock. I don't want a lawyer with bad reviews. And I will take your advice and write down the bible as soon as I get commissary. Lawyer say [sic] he trying to help me but I never see him only 3 times. This is my freedom on the line.

*Id.* at *2. At a pretrial hearing, Hampton said that he had not seen his lawyer in two weeks. The court of appeals summarized the ensuing colloquy with the trial judge:

> The court acknowledged that Hampton was worried, but asked whether "other than him not seeing you in two weeks, anything else?" Hampton responded, "No. I was just told I was gonna see him that day and I ain't see [sic] him," which was disappointing. The court asked Hampton's lawyer to "try harder to keep promises," so that Hampton could feel better. Hampton's lawyer, however, stated that although he did not "think that there's any basis upon which [Hampton] had a

> legitimate complaint," he thought the bond between them was broken because Hampton had twice complained about his representation. Hampton's lawyer stated that he was "fed up with it." The court noted that the request for a new lawyer was not based on performance, and denied Hampton's request.

*Ibid.*

The court of appeals found no abuse of discretion in the trial court's refusal to appoint another lawyer for Hampton. It pointed to Hampton's own statement that there were no reasons for the request beyond Hampton's complaint about jail visits that were too infrequent. The court believed that there was no reason for the trial judge to inquire further into the attorney-client relationship. The court also found that Hampton failed to show good cause for the substitution because the record did not establish that he and his lawyer had "a legitimate difference of opinion . . . with regard to a fundamental tactic." *Ibid.* The court also dismissed the idea that Hampton was "completely" deprived of counsel resulting from attorney and client becoming "embroiled in irreconcilable conflict." *Ibid.* The court concluded that "despite his problems with his lawyer, there is no indication that Hampton was completely deprived of the assistance of his lawyer during any critical stage of the criminal proceedings." *Id.* at *3.

That ruling did not contravene or unreasonably apply federal law, and it was not an unreasonable determination of the facts. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[I]mplicit in this guarantee is the right to be represented by counsel of one's own choice." *Linton v. Perini*, 656 F.2d 207, 208 (6th Cir. 1981). But "[t]he right to the assistance of counsel at trial does not guarantee that a criminal defendant will be represented by a particular attorney," whom he does not retain himself. *Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1351 (6th Cir. 1993); *see also Caplin & Drysdale, Chartered v. United States*,

491 U.S. 617, 624 (1989) (holding that "impecunious defendants [do not] have a Sixth Amendment right to choose their counsel" and "have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Simply stated, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).

When a defendant seeks substitution of appointed counsel late in the case, "he must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution." *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985).

It is true that "a trial court, acting in the name of calendar control, cannot arbitrarily and unreasonably interfere with a client's right to be represented by the attorney he has selected." *Linton*, 656 F.2d at 209. But a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (internal and end citations omitted); *see also United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971) ("A motion for new court-appointed counsel based upon defendant's dissatisfaction with his counsel previously appointed is addressed to the sound discretion of the trial court.").

Factors that courts may consider when reviewing substitution motions include "the timeliness of the motion; the adequacy of the [trial] court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Martel v. Clair*, 565 U.S. 648, 663 (2012). When evaluating the extent of the conflict between the defendant and his attorney, a court may consider whether the conflict "was so great

that it resulted in a total lack of communication preventing an adequate defense." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

Although Hampton's requests for substitution of counsel were timely, he did not show that the conflict between himself and his attorney was so great that it resulted in a total lack of communication, which prevented an adequate defense. *United States v. Jennings*, 83 F. 3d 145, 149 (6th Cir. 1996). The sole basis of his complaint — too few visits from his lawyer at the jail — did not lead to a breakdown in communication between him and counsel that was so complete that it deprived him of an adequate defense. *See United States v. Jackson*, 628 F. App'x 384, 387 (6th Cir. 2015). Hampton's related complaint about not having sufficient time to discuss all of his issues in detail with his attorney does not establish that there was a serious conflict or inability to communicate that would justify the substitution of counsel. *See United States v. Justice*, 14 F. App'x 426, 430-31 (6th Cir. 2001). The record in this case does not demonstrate that the disagreements between Hampton and his attorney rose to the level of a conflict sufficient to justify the substitution of counsel. *United States v. Sullivan*, 431 F.3d 976, 981 (6th Cir. 2005).

Moreover, the district judge at the preliminary examination and the trial judge again at the pretrial hearing in circuit court sufficiently inquired into Hampton's allegations of ineffectiveness against counsel. Because there were "lengthy discussions" about the alleged conflicts between Hampton and his counsel, the state courts did not abuse their discretion by denying Hampton's motion to substitute counsel. *See United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009). And Hampton is unable to show that he was prejudiced by proceeding to trial with the originally appointed attorney because he received effective assistance of counsel at trial. *Vasquez*, 560 F.3d at 468. "The strained relationship" between Hampton and his attorney did not amount to a

"complete breakdown in communication" that prevented the petitioner from receiving an adequate defense. *Ibid.*

Hampton's argument that he suffered a complete denial of counsel because of his attorney's failure to visit him more often in jail is a nonstarter. The Supreme Court has held that the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice. *United States v. Cronic*, 466 U.S. 648, 659 (1984). But that relief is reserved for instances of certain structural defects in a trial that result in the deprivation of counsel altogether, such as when counsel is either totally absent or prevented from assisting the accused during a critical stage of the proceedings. *Cronic*, 466 U.S. at 659, n.25; *United States v. Minsky*, 963 F. 2d 870, 874 (6th Cir. 1992). It also can occur when counsel entirely fails to subject the prosecution's case to "meaningful adversarial testing." *Moss v. Hofbauer*, 286 F. 3d 851, 860 (6th Cir. 2002) (quoting *Cronic*, 466 U.S. at 659). In those instances, reversal of the conviction is automatic because it infects the entire trial process. *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993). That did not happen here. Hampton's trial attorney vigorously represented him during pretrial motion hearings and robustly cross-examined the state's witnesses at trial. To obtain relief, Hampton must show that he was prejudiced by the state courts' rulings that denied substitution of counsel. He has not done so here. *See Bowling v. Parker*, 344 F. 3d 487, 506 (6th Cir. 2003) (holding that the trial attorneys' alleged failure to consult with the defendant did not prejudice the defendant in capital murder case, and thus could not amount to ineffective assistance, although the attorneys allegedly met with defendant for less than one hour in preparing defense, because the defendant failed to show how additional consultation with his attorneys could have altered the outcome of the trial).

Hampton is not entitled to relief on his claim.

B.

Hampton next argues he was denied a fair trial because of prosecutorial misconduct and that his trial counsel was ineffective by failing to object. He says that the prosecutor's argument shifted the burden of proof to the defendant, he elicited misleading testimony from an expert witness, he aggravated that error in his rebuttal argument, he presented perjured testimony, he attempted to appeal to the jury's sympathies, and he made an improper argument at a pretrial hearing dealing with a missing witness. We will address each of these arguments in turn.

Generally, though, a prosecutor's misconduct will require habeas corpus relief when the conduct complained of "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), and calling *Darden* the "clearly established Federal law" on the issue). *Parker* notes that "the *Darden* standard is a very general one," which permits state courts "more leeway . . . in reaching outcomes in case-by-case determinations[.]" *Id*. at 48 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). On habeas review, the AEDPA raises the bar even higher than the "high standard" set by *Darden*. *Halvorsen v. White*, 746 F. App'x 489, 499 (6th Cir. 2018) (citing *Parker*, 567 U.S. at 48). To obtain habeas relief, "[t]he misconduct must so clearly violate *Darden* that the state court's failure to identify it was not just erroneous, but 'objectively unreasonable.'" *Id*. at 497 (citing *Williams*, 529 U.S. at 409). *Darden* itself did not find unconstitutional a prosecutor's characterization of the defendant as an "animal" or his expressed wish that he "could see [the defendant] with no face, blown away by a shotgun." *Darden*, 477 U.S. at 180, nn.11, 12. Even where prosecutors' statements are so extreme as to be "universally condemned," the inquiry remains whether due process was denied. *Id*. at 181.

1.

Hampton says that the prosecutor presented a closing argument that impermissibly shifted the burden of proof to the defense. He points to parts of the argument that addressed several of the charged counts, including the felonious assault charge that ended in an acquittal:

> You're not allowed to have a concealed weapon in your workplace without a permit. There's no evidence he had a permit.
>
> So, you heard from Danny Jones. The defendant told him he had a CPL [concealed pistol license]. Well, that doesn't mean he had a CPL because he didn't. There has been no evidence that he actually had a CPL, all right. So, if you find he had the gun concealed, he's guilty of that crime of CCW.

ECF No. 11-7, PageID.632.

> There is no reasonable doubt that Mr. Hampton shot Mr. Holmes. There is no reasonable doubt to that. There's been no contradictory evidence whatsoever; same thing with the felonious assault, carrying concealed weapon felony firearm [sic].

ECF No. 11-7, PageID.633.

> Now you can look at the facts objectively that have been testified to and know that they never got closer than five feet, didn't have a weapon this is uh well regulated area with security. It's not reasonable to assume he thought he was gonna die. There has been zero, none, no evidence whatsoever that he thought he was uh anything bad was gonna happen to him. Amazing he didn't get closer than five feet. It was — the idea that you're gonna infer his thoughts about death, it's just ridiculous. There is no evidence whatsoever that he acted in lawful self-defense, none it's not even close. There — it's just — no one testified to anything that justifies deadly force in this case, not at all.

ECF No. 11-7, PageID.646.

> So the last thing I wanna say is, Mr. McCarthy [defense counsel] says the defendant was in fear. There is like literally no evidence of that none, zero. Nobody told you the defendant was in fear; nobody told you the defendant is excited um you know screaming, was attack; that the man got any closer than five feet to him. No, there is zero evidence that he was in fear, none whatsoever.

ECF No. 11-7, PageID.648-49.

The Michigan Court of Appeals found no fault with these arguments. It held that the prosecutor did no more than comment on the weakness of the self-defense claim, and that it was proper to argue that the evidence favoring the prosecution was uncontradicted, even if the defendant was the only person who could have contradicted it. The court also relied on the jury instructions correctly defining the burden of proof and the presumption that juries follow the instructions as extinguishing any prejudice that could have been caused by the prosecutor's argument. *Hampton*, 2018 WL 4575175, at *5.

That holding reasonably applied federal law. A prosecutor may not comment on the failure of a defendant to produce evidence, but he may summarize the evidence and comment on its quantitative and qualitative significance. *United States v. Bond*, 22 F. 3d 662, 669 (6th Cir. 1994); *See also Byrd v. Collins*, 209 F. 3d 486, 534, n. 41 (6th Cir. 2000). "[A] prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the government's case" as long as the prosecutor does not argue or imply the defendant bears the burden of proof. *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir.1993). A prosecutor is also free to point out the absence of any evidence that would factually support any defense theories. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). The prosecutor's comments, when viewed in context, were proper because they simply pointed out the lack of evidentiary support for Hampton's self-defense claim.

The court of appeals also properly applied federal law when it held that any possible prejudice that might have resulted from the comments was cured by the trial court's instructions regarding the proper burden of proof. *See Scott v. Elo*, 302 F. 3d 598, 603-04 (6th Cir. 2002).

2.

Hampton next argues that the prosecutor improperly elicited misleading testimony from an expert witness to suggest that the petitioner jumped into a pond. But he offers no argument as to

why that question was improper. The prosecutor merely asked the witness — an expert in "body fluid identification" — whether getting clothes wet before any blood has dried on them could have an effect on her ability to recover the blood. ECF No. 11-7, PageID.608. The prosecutor's question was not misleading; it was based on circumstantial evidence suggesting that Hampton had jumped into the pond. The prosecutor simply asked the witness to explain how that would have affected the ability to recover evidence. In any event, a prosecutor "does not commit misconduct by asking questions that elicit inadmissible evidence." *Dufresne v. Palmer*, 876 F.3d 248, 261 (6th Cir. 2017) (quoting *Key v. Rapelje*, 634 F. App'x 141, 148 (6th Cir. 2015)).

Hampton also argues that the prosecutor compounded this misconduct by referring to that testimony in his rebuttal argument. The prosecutor stated:

> The defendant goes ahead and jumps in a pond to destroy evidence um destroys his cell phones which would contain who knows what. His clothes get soaking wet, covered in mud um I guess prior to destroying his cell phones, he supposedly called the police; and no one has even testified that it's his voice. But the Defense thinks that's his voice so that's an admitted exhibit. You can consider that.

ECF No. 11-7, PageID.648. The Michigan Court of Appeals held that the argument was a fair response to the defense argument that Hampton made the 9-1-1 call to the police. *Hampton*, 2018 WL 4575175, at *6.

There was no misapplication of federal law in that ruling. It was proper for the prosecutor to make references to Hampton jumping into a pond because the act could have constituted an attempt to flee, or to hide, conceal, or destroy evidence, which in turn could imply consciousness of guilt. *See Richardson v. Palmer*, 941 F.3d 838, 851 (6th Cir. 2019). Similarly, it was proper for the prosecutor to bring up the 911 call and question whether Hampton was the person on the phone. The "prosecution has "wide latitude" during closing arguments to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009). The

prosecutor's remarks were proper because they were responsive to defense counsel's closing argument that Hampton had called the police to report the shooting.

3.

Hampton argues that the prosecutor committed misconduct at a due diligence hearing conducted to determine why prosecution witness Jasmine Gonzales-Sims failed to appear in court. The alleged misconduct came from eliciting statements from a police detective who said that he was told Gonzales-Sims was avoiding her subpoena because she was afraid of retaliation by Hampton and his family. The Michigan Court of Appeals rejected this claim because the questioning did not occur during trial and the jury never heard the testimony. *Hampton*, 2018 WL 4575175, at *7. Because the prosecutor's questions were not made in the presence of the jury, Hampton suffered no harm in this case. *See United States v. Phibbs*, 999 F. 2d 1053, 1068 (6th Cir. 1993) (holding that the defendant suffered no harm from the government's repeated attempts to admit allegedly prejudicial testimony relating to meetings involving the acquisition of cocaine because such evidence was never presented to the jury).

4.

Hampton also accuses the prosecutor of presenting perjured testimony. Hampton says that Zigler and another witness, Danny Jones, testified falsely that Zigler attempted to render first aid to the victim. A prosecutor may not knowingly present false evidence, *Giglio v. United States*, 405 U.S. 150, 153 (1972), or allow false evidence or testimony to go uncorrected, *Napue v. Illinois*, 360 U.S. 264, 269 (1959). But Hampton does not develop this argument be explaining how that testimony was false. Conclusory allegations of perjury in a habeas corpus petition must be corroborated by some factual evidence. *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir. 1971). There is no evidence that Zigler testified falsely on this matter. And a responding police

officer testified that he saw rags, which appear to have been used to aid the victim. ECF No. 11-6, PageID.573-74. Hampton has not shown that the prosecutor presented perjured testimony.

5.

Hampton next argues that the prosecutor improperly attempted to appeal to the jury's sympathies by commenting that Hampton shot the victim "right in the middle" and that "he's a good shot." ECF No. 11-7, PageID.646. The prosecutor's remarks did not improperly appeal to the sympathy of the jury because they were common-sense inferences based on the evidence introduced at trial. *See*, *e.g.*, *United States v. Smith*, 89 F. App'x 494, 498 (6th Cir. 2004).

Alternatively, Hampton argues that trial counsel was ineffective because he did not object to the prosecutorial misconduct. But because the prosecutor's remarks did not deprive Hampton of a fundamentally fair trial, he cannot show that he was prejudiced by counsel's failure to object. *Slagle v. Bagley*, 457 F. 3d 501, 528 (6th Cir. 2006).

Hampton is not entitled to relief on his second claim.

C.

Hampton's argument that the evidence was insufficient to support his first-degree murder conviction was rejected by the Michigan Court of Appeals. That court found that the use of a firearm — deadly force — established an intent to kill, and the amount of time between the confrontation between Hampton and Holmes, albeit brief, was enough to prove premeditation and deliberation. That court also found that the evidence was sufficient to defeat the defense of self-defense. *Hampton*, 2018 WL 4575175, at *4.

Overcoming those conclusions here is a daunting task for Hampton. The Supreme Court has clearly established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But on habeas review, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A defendant making such a challenge bears a very heavy burden, especially given that circumstantial evidence alone is sufficient to sustain a conviction and a jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *United States v. Farrad*, 895 F.3d 859, 971 (6th Cir. 2018) (quotation marks and citations omitted).

This Court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*). First, it is the jury's responsibility to decide what conclusions should be drawn from the evidence admitted at trial. *Ibid.* "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Ibid.* (quotation marks and citation omitted); *accord Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017); *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009).

In a habeas case, the *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. The jury found Hampton guilty of first-degree premeditated murder. Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. Mich. Comp. Laws § 750.316; *People v.*

*Oros*, 502 Mich. 229, 241, 917 N.W.2d 559, 565 (2018). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329, 187 N.W.2d 434, 449 (1971). Under Michigan law, while the minimum time required to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469, 227 N.W.2d 535, 539 (1975), *overruled on other grounds by People v. Graves*, 458 Mich. 476, 581 N.W.2d 229 (1998). The Michigan Supreme Court has held that "an interval of time between the initial homicidal thought and ultimate action" is enough to prove "[p]remeditation and deliberation." *Oros*, 502 Mich. at 242, 917 N.W.2d at 566. There must be evidence of "some time span between the initial homicidal intent and ultimate action," but it is for the jury "to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Ibid.* (quotation marks and citation omitted). And that time span may be "only a brief moment of thought or a matter of seconds." *Ibid.* (quotation marks and citation omitted). Premeditation and deliberation may be established by evidence showing "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170, 486 N.W.2d 312, 318 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736, 745 (1999).

Not much time elapsed between the initial approach by Holmes against Hampton — "less than a minute," according to the court of appeals. *Hampton*, 2018 WL 4575175, at *4. But Holmes's aggressive approach suggests that the two had been in an argument earlier, and Hampton continued to back away as Holmes advanced. Hampton put some distance between them, and then

- 17 -

he decided to reach for his gun and shoot Holmes in the chest at fairly close range. The court of appeals ascribed significance to the fact that Hampton brought a concealed firearm to work, and that in the seconds between the initial confrontation and the shot, Hampton had time to decide to draw the weapon, aim, and inflict the mortal wound mid-chest. *Ibid.* That determination accurately reflected state law and reasonably applied the *Jackson* standard. Evidence that Hampton had a prior dispute with Holmes supports a reasonable inference that the subsequent shooting was premeditated. *Scott*, 302 F.3d at 603. And premeditation may be inferred logically from wounds inflicted on vital parts of the victim's body. *See Lundberg v. Buchkoe*, 338 F.2d 62, 69 (6th Cir. 1964). Moreover, Hampton discarded his firearm and jumped into a nearby pond after the shooting, either in an attempt to flee the scene, to hide from the police, or to wash off any blood or gunshot residue. This post-homicide conduct also supports a finding of premeditation. *See, e.g.*, *Marsack v. Howes*, 300 F. Supp. 2d 483, 492 (E.D. Mich. 2004).

The Michigan Court of Appeals also held that the evidence was sufficient to prove that the killing was not justified. Under Michigan law, self-defense is justification for a homicide. *People v. Dupree*, 486 Mich. 693, 707, 788 N.W.2d 399 (2010). If a defendant offers some evidence that he acted in self-defense, the prosecution must produce evidence that "exclude[s] the possibility of self-defense beyond a reasonable doubt." *People v. Stevens*, 306 Mich. App. 620, 630, 858 N.W.2d 98 (2014) (quotation marks and citation omitted). That burden must include proof that the defendant did not honestly and reasonably believe that the use of deadly force was necessary to prevent death or great bodily harm. *People v. Guajardo*, 300 Mich. App. 26, 35-36, 832 N.W.2d 409 (2013) (citing Mich. Comp. Laws § 780.972(1)).

The court of appeals reasoned that the evidence was sufficient to prove lack of justification based on the distance between the two men at the time of the shooting, the lack of evidence that

Holmes was armed or was reaching for the weapon, and Hampton's post-shooting conduct. *Hampton*, 2018 WL 4575175, at *4. That determination reasonably applies *Jackson*'s rule, which requires viewing the evidence in the light most favorable to the prosecution.

Hampton also argues that the prosecutor used inadmissible evidence from expert witness Miranda Irwin to suggest that Hampton jumped into a pond. But he does not explain why this evidence was inadmissible. In any event, when determining a sufficiency-of-evidence claim, the "'reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988)).

Hampton is not entitled to relief on his sufficiency-of-evidence claim.

D.

Lastly, Hampton argues that the trial court erred by failing to instruct the jury to infer that the testimony of Jasmine Gonzales-Sims, who failed to appear in court, would have been unfavorable to the prosecution. The Michigan Court of Appeals held that no such instruction was required because the prosecution established at a pretrial hearing that it had engaged in reasonable efforts for over a month to locate the witness without success. *Hampton*, 2018 WL 4575175, at *4.

That decision will not support a federal habeas writ. Even if the refusal to give the instruction were error, Hampton must snow that the error so infected the entire trial that the resulting conviction violates due process, not merely that the omission or incomplete instruction amounted to error. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977). A criminal defendant does not have a clearly established federal right to a missing witness instruction. Hampton, therefore, cannot obtain federal habeas relief based on the state court's refusal to give an instruction

to his jury regarding the prosecution's failure to produce witnesses. *Stadler v. Curtin*, 682 F. Supp. 2d 807, 821-22 (E.D. Mich. 2010).

III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d). The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

                                                                         s/David M. Lawson
                                                                          DAVID M. LAWSON
                                                                          United States District Judge

Dated: May 4, 2022